# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re:<br><br>ROBERT LEE GOLBA and<br>ANNELLE Y. GOLBA,<br><br>    Debtors. | Case No. 09-17649 MER<br><br>Chapter 7 |
| In re:<br><br>GREG MATTHEW ROLLISON<br><br>    Debtor. | Case No. 09-27801 HRT<br><br>Chapter 7 |
| KELVIN KNAUB and HOLLY KNAUB<br><br>    Plaintiffs,<br><br>v.<br><br>ROBERT LEE GOLBA,<br><br>    Defendant. | Adversary No. 09-1551 MER |
| KELVIN KNAUB AND HOLLY KNAUB,<br><br>    Plaintiffs,<br><br><br><br>GREG MATTHEW ROLLISON,<br><br>    Defendant. | Adversary No. 10-1476 MER |

## ORDER

    The above adversary proceedings concern the Plaintiffs' problems with a home they purchased from an entity alleged to have been represented or controlled by the Defendants. The Plaintiffs obtained an agreement for the construction of a new home or the purchase of a replacement home, but the construction or replacement did not take place. The Plaintiffs now seek findings the debts owed to them by the Defendants are nondischargeable.

**BACKGROUND FACTS**

Debtors Robert and Annelle Golba (the "Golbas") filed their voluntary Chapter 7 petition on April 28, 2009. Debtor Greg Rollison ("Rollison") filed his voluntary Chapter 7 petition on August 27, 2009. Plaintiffs Kelvin and Holly Knaub (the "Knaubs") filed Adversary No. 09-1551 against the Golbas and several related entities on September 11, 2009, and filed Adversary No. 10-1476 against Rollison on July 1, 2010. Annelle Golba was dismissed as a party defendant from Adversary No. 09-1551 on October 20, 2010.

The two adversary proceedings were consolidated for purposes of trial on November 24, 2010. On December 26, 2010, the Court issued an amended order regarding consolidation, indicating the adversary cases would proceed in parallel, but not be substantively consolidated. On June 28, 2011, the Court ordered the dischargeability claims of the two adversary cases would be heard first, with the damages portion, if necessary, to be heard at a later time.[1] The dischargeability claims proceeded to trial, and the Court permitted post-trial briefing.

A.  **Procedural Background of Adversary Cases**

   1.   *Adversary No. 09-1551 MER (Golba)*

The Knaubs' Complaint against Golba alleges they purchased a home from an entity known as Gemm Homes ("Gemm") on May 1, 2003. Thereafter, the home evidenced drywall cracking and other problems. The Knaubs had testing done in 2006 which revealed the foundation had been laid improperly, causing the structure to settle. According to the Complaint, Robert Golba ("Golba") worked in sales and marketing for Gemm beginning in 2005. After the testing in 2006, Golba and other defendants negotiated with the Plaintiffs on behalf of Gemm, and offered to construct a new home if the property was reconveyed to Gemm.

The Knaubs further allege that in February 2007, Golba formed Avalon Homes ("Avalon"), of which he owned 90%. The name at the office of Gemm was changed to Avalon Homes, and Avalon assumed the contract between the Knaubs and Gemm. The Knaubs and Avalon entered into a verbal agreement under which Avalon would construct a new home for the Plaintiffs on a different lot in the same subdivision, following which the Knaubs would convey the defective property to Avalon. However, Avalon did not complete the purchase of the new lot.

According to the Complaint, Gemm transferred all its assets and liabilities to Avalon for no consideration, and Golba and others represented that Gemm's principal, Rollison, and Gemm had no connection to or interest in Avalon. However, the Knaubs allege Avalon was partly owned by Rollison's son, and Avalon made payments to

---

[1] See Minutes of Proceeding of Status Conference held June 28, 2011 (Docket No. 51), and Order and Notice of Trial issued June 30, 2011 (Docket No. 53). This procedure was suggested by and agreed to by counsel for the Plaintiffs and the Defendant in each adversary proceeding.

Rollison, rather than using its revenue for business purposes such as completing the Knaubs' new home. They further allege Avalon Homes was just a continuation of Gemm, and Avalon Homes and any related entities were set up to hinder and delay creditors and use the assets of Gemm for Golba's and Rollison's personal benefit.

The Complaint contains the following claims for relief: 1) for damages caused by fraudulent representations and false pretenses under 11 U.S.C. § 523(a)(2)(A),[2] based on Golba's misrepresentation that Gemm and Rollison were not involved in Avalon; 2) for damages caused by actual fraud under § 523(a)(2)(A), based on Golba's and Rollison's alleged conspiracy fraudulently to convey the assets of Gemm to the Avalon entities; and 3) for damages caused by breach of fiduciary duty under § 523(a)(4), alleging Gemm was an insolvent company which owed a fiduciary duty to its creditors, and alleging Golba participated in transferring Gemm's assets to Avalon for no consideration.

On October 20, 2010, the Court entered an Order granting in part and denying in part the Defendants' Motion to Dismiss. The Court granted the motion to dismiss Annelle Golba as a party defendant, granted the motion to dismiss the third claim for relief under § 523(a)(4), but denied the motion to dismiss the first and second claims for relief under § 523(a)(2)(A).

Golba's Answer denies he committed fraud, and raises the following affirmative defenses: 1) waiver, laches, estoppel, unclean hands, release, statute of frauds, and statute of limitations; 2) failure to mitigate; 3) collateral estoppel; and 4) failure to state a claim.

### 2. *Adversary No. 10-1476 MER (Rollison)*

The Knaubs' Complaint against Rollison states Rollison was a principal of Gemm, and was personally involved in the construction of the Knaubs' defective home. CDS Engineering allegedly designed the foundation of the home, but the foundation was not built according to the engineering specifications, and Rollison and Gemm did not arrange for a proper inspection. After the Knaubs discovered cracks in the drywall, they were assured by representatives of Gemm such cracks were not a concern. The Knaubs continued to have problems, but Gemm and Rollison did not address them. Gemm and Rollison eventually had CDS Engineering perform an analysis, and CDS discovered the foundation had not been laid on stable ground. Thereafter Gemm, Golba, and Rollison negotiated with the Knaubs and offered to construct a new home for them.

According to the Complaint, during these negotiations, Avalon was formed by Golba in Wyoming on February 14, 2007, at a time when Gemm was insolvent. Rollison's son Miles owned a portion of Avalon until July 25, 2007. In addition to allegations concerning the verbal agreement that Avalon would complete a new home for the

---

[2] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

Knaubs, the Complaint states after the creation of Avalon, all employees of Gemm became employees of Avalon, all assets of Gemm became assets of Avalon, and the transfers of Gemm's assets were for no consideration. Rollison was involved in establishing Avalon, and encouraged vendors of supplies and subcontractors to conduct business with Avalon. Gemm ceased operating in the spring of 2007.

The Complaint alleges Rollison was involved in the daily affairs of Avalon even though he and Golba represented to creditors that Rollison and Gemm had no connection to Avalon, including making such statements in sworn affidavits. However, shortly after Avalon was formed, Gemm transferred over $100,000 in assets to Avalon, and Avalon used the money to open an account at Bank of Choice in Ft. Collins. This Bank of Choice account was used to pay personal expenses of Rollison, including expenses of Miles Rollison in Europe. The Avalon funds were also paid to an entity known as Golba Real Estate. The Complaint alleges instead of paying Rollison for services to Avalon, Avalon paid funds to Rollison's wife, Marcie, to conceal the money from creditors. In addition, payments were made to Golba, who transferred funds to Rollison to conceal funds from creditors. Many payments to Rollison were made while the Avalon Homes account was negative, or the payments caused the account to become negative.

Although Golba stated in an affidavit he was not involved with Gemm, and although the manager of Gemm was Vanguard Holdings, Gemm and Vanguard guaranteed construction loans for Avalon, and Golba and Rollison signed the guaranties for Gemm and Vanguard as members of Vanguard. Further, although Golba claimed none of the managers or owners of Gemm were managers or owners of Avalon, Rollison signed contracts wherein he represented he was a manager of Avalon, and Rollison and Golba represented themselves as partners of Avalon. Therefore, the Complaint alleges, Avalon was a continuation of Gemm, used by Golba and Rollison to shield assets from creditors and they used Gemm assets for their personal benefit.

On June 5, 2008, Golba formed Avalon Homes of the West, LLC, alleged to be a continuation of Gemm and Avalon. Real property belonging to Avalon which once belonged to Gemm was transferred to Avalon Homes of the West for no consideration.

The Knaubs allege they have fulfilled their obligations under their agreements with Gemm/Avalon. They further allege the cost to repair their original property is $184,816.

Similar to the Complaint against Golba, the Complaint against Rollison contains the following claims for relief: 1) false pretenses and false representation under § 523(a)(2)(A); 2) actual fraud under § 523(a)(2)(A); and 3) breach of fiduciary duty under § 523(a)(4).

Rollison's Answer denies the existence of false pretenses, actual fraud, or breach of fiduciary duty. It does not state any affirmative defenses.

**B.     Evidence at Trial**

   *1.     Cameron's Testimony*

Jeremy Cameron ("Cameron"), an employee of Gemm and the "contact person" for the Knaubs, testified he performed warranty work on the Knaubs' home in the summer of 2006 at Rollison's direction, including patching drywall and epoxying the crack in the foundation.  At the end of 2006, Cameron and Gemm concluded they could not fix the settling problems, and he, Rollison, and Golba met with the Knaubs to discuss the proposal to build them a new home.  Rollison made the decision to offer the new home.  He directed Cameron to draw up blueprints for it, and directed Golba to find a lot in the subdivision that would work for the new home.

Cameron also described a meeting he attended at the end of 2006 in which "it was determined that the company was going to change names, change companies and we were going to proceed forward as Avalon Homes."  He stated Rollison, Golba, and Neil Ackerman were at the meeting, and the company change was made because Gemm was having difficulty paying its subcontractors.  Cameron stated Avalon would be in the business of constructing new homes in Colorado and Wyoming, the same as Gemm had been, and asserted Rollison made the day-to-day decisions for Avalon Homes.  Cameron did not know who owned Avalon, but stated the company finished some of Gemm's unfinished projects and started some of its own.

   *2.     Yaromy's Testimony*

Tamara Yaromy, the bookkeeper for Gemm and later Avalon, testified although she was told Miles Rollison and Golba were the principals of Avalon, she believed Rollison really ran Avalon.  She stated Golba was involved in sales and marketing, as he had been with Gemm.  As Rollison and Golba instructed her, she informed creditors of Gemm they needed to contact Rollison directly.

In her examination of bank records from Gemm and Avalon, she noted Gemm transferred funds to several Avalon bank accounts, including an account at Bank of Choice.[3]  She further noted Rollison paid personal expenses from Avalon's Bank of Choice account, and instructed her not to question the payments.[4]  By contrast, she stated Golba never took any money from Avalon accounts that was not his earned compensation or reimbursement.  Moreover, she stated Golba often put money into Avalon accounts to cover expenses Avalon could not meet.

---

[3] Specifically, she identified a cashier's check from Gemm's account to Avalon's Bank of Choice account in the amount of $137,130.01.  See Knaubs' Exhibit 48.  She also identified transfers from Gemm to Avalon totaling approximately $469,000, which she stated were loan proceeds for loans to Gemm on projects Gemm had not finished, but were finished by Avalon. The total transfers from Gemm to Avalon were $648,977.00.  See Knaubs' Exhibits 16 and 17.

[4] See Knaubs' Exhibits 19 and 50.

### 3. *Holly Knaub's Testimony*

Holly Knaub testified she and her husband still live in the home with the foundation problems, and have since 2003, when they purchased it from the builder, Gemm.[5] She stated the Knaubs themselves looked at the property, but made no mention of a separate evaluation by a building inspector.

The Knaubs purchased the home for $259,000, and shortly thereafter made claims under the home's warranty, because they started noticing such things as cracks in walls, stairs separating from the walls, and windows which were not shutting properly. Sometime in 2005, after numerous telephone calls with Gemm representatives, Cameron, then a Gemm employee, started working on repairs. However, the repairs did not last. Eventually CDS Engineering tested the soil around the home and found the home's foundation was laid on fill, rather than on natural soil as called for by the original engineering specifications. By December 2006, Cameron told her nothing further could be done in the nature of repairs, and Mrs. Knaub began contacting Rollison.

According to Mrs. Knaub, Rollison did not set up meetings regarding the issues with the home until after the Knaubs had hired an attorney.[6] Then, several conversations occurred, sometimes by telephone and sometimes in person, involving Golba, Rollison, engineers, and others. Mrs. Knaub stated after conversations with Rollison, the Knaubs were left with the impression their house would be bought back from them, and a new house constructed. She believed Golba was involved in the conversations due to his anticipated role in remarketing the house. According to Mrs. Knaub, Golba felt the home could be repaired and resold.

In April or May, 2007, after the Knaubs' attorney sent Rollison a letter requesting action on their complaints, the Knaubs met with Rollison at Avalon's office. Mrs. Knaub believed the business had transformed from Gemm to Avalon. She stated Rollison showed them a big spreadsheet of a subdivision he was developing near Avalon's office in Loveland. Specifically, she recalled Rollison speaking for approximately forty-five minutes, indicating he was acquiring a large parcel of land right around his office, and showing the Knaubs a large drawing of the plan for the roads, the lots and the houses, which indicated the development's proximity to the new Wal-Mart in Loveland. Rollison stated this development would be built up quickly because of the access to shopping and to the foothills. She further remembered remodeling taking place in the Avalon office. From this presentation, she obtained the impression Rollison was capable of buying the Knaubs' home and building them a new one.

She stated Cameron attended the meeting, although Golba did not attend, and the decision was made that "they" (apparently Avalon) would build the Knaubs a new house on the lot of their choice and would buy the first house back. Mrs. Knaub also recalled

---

[5] See Knaubs' Exhibit 1.

[6] See Knaubs' Exhibit 32.

Rollison indicating he understood how upset the Knaubs were with the house, comparing it to being dissatisfied with a defective vehicle.

Thereafter, Mrs. Knaub stated, Cameron drew up a floorplan for the proposed new house. Mrs. Knaub stated the Knaubs met with Cameron regarding the plans three or four times, and sometimes Rollison was in attendance. Rollison continued to state he was going the make the Knaubs happy and see the project though to the end.

At around the same time, the Knaubs contacted Golba and had several meetings with him regarding an offer on the lot they had chosen for the new home. Rollison instructed the Knaubs to use Golba as their contact from that point on with respect to progress on the new home. The Knaubs believed a contract to purchase had been placed on the building lot they chose, because an "under contract" sign was placed on the lot in May of 2007. Mrs. Knaub further stated they believed the new home process was progressing because Golba told them financing was being obtained and the matter was moving forward. Therefore, around May of 2007, they discontinued their attorney's representation.

According to Mrs. Knaub, the plans for the new home were completed in late May or early June 2007, and Rollison told them the new home would probably be finished in September 2007. Shortly thereafter, however, Golba informed the Knaubs that Rollison was having trouble obtaining financing to retain the building lot.

Eventually, Golba told them the financing could not be obtained, and offered to show them existing homes for sale, in the same subdivision, which could be traded for their current home. He showed them two properties, and they selected one for the proposed trade. However, Golba later informed them financing was again a problem, and asked the Knaubs if they cared where the financing came from. Finally, at the end of the summer of 2007, according to Mrs. Knaub, Golba told the Knaubs they (apparently Avalon) could not do anything to help them and the Knaubs should retain counsel.

### 4. Golba's Testimony

Golba stated he started working with Gemm exclusively in 2006, performing sales and marketing. He believed Rollison was the principal of Gemm.[7] According to Golba, Gemm stopped doing business because it was in trouble with creditors. He testified Avalon was formed in February 2007.[8] He believed the market for new homes was good in Laramie, Wyoming, and believed an ownership interest in Avalon would give him an opportunity to get into the building portion of the business. Initially, Golba owned 10% of Avalon and Rollison's son, Miles Rollison, owned 90%. He acknowledged Rollison was

---

[7] He noted Vanguard Holdings was an entity controlled by Rollison, which could have had an ownership interest in other properties, and could have been the parent company of Gemm. Golba never received money from Vanguard Holdings, nor did he participate in its management.

[8] See Knaubs' Exhibit 34.

running the construction activities of Avalon, although he did not own Avalon. Golba further stated Miles Rollison left the business after four or five months, and Golba acquired the remaining interest in Avalon.

Golba first contacted the Knaubs in late 2006 to assess the problems they were having with their home. He admitted to being present for at least one of the meetings the Knaubs had with Rollison and Cameron. He further stated Rollison took his advice that the Knaubs would not be happy with a solution short of repurchasing their house and building a new one.

He conceded Gemm ceased operating by April 2007, and noted neither Rollison nor Gemm had any money. He agreed funds were transferred from Gemm to Avalon to finish Gemm homes that had been started. He believed Avalon was formed because of Gemm's problems with creditors. Although he knew Gemm had no money at the time he and Rollison met with the Knaubs to discuss the proposed new home, he believed Rollison still had credit personally to enable him to perform on the new home.

Golba acknowledged Avalon began working with the Knaubs on their new home around the time of the parties' April 2007 meeting, and he arranged for Rollison to put the building lot under contract. He believed the lot was under contract to Gemm. He admitted at the time the lot contract was being arranged, he knew Gemm was in financial trouble, but continued to believe Rollison had other resources. Eventually, he contacted the Knaubs and told them there was financing trouble with the lot. By the end of the summer of 2007, he informed them they were on their own, as Rollison could not obtain financing. He did not remember showing the Knaubs possible replacement homes.

Golba conceded he knew the Knaubs were relying on Gemm and later Avalon to address the issues with their home and build them a new home, and acknowledged at the time he was working with the Knaubs, he was receiving compensation from Gemm or Avalon. However, he stated he was told by Rollison the financing would work out for the Knaubs' new home, and he so informed the Knaubs.

He believed Rollison's statements that Rollison had other lines of credit and financial resources other than Gemm to draw on to finance the Knaubs' home. He testified he did not discover until approximately the summer of 2008 there were no additional resources to support financing. However, he testified Rollison was not authorized to enter into a contract as a manager of Avalon, and when Golba discovered Rollison had done so, he changed the contract to reflect himself as the manager.[9]

Golba further acknowledged Avalon paid for Miles Rollison's trip to Europe after Miles left the company. He believed there might have been some compensation owing to Miles which was paid by covering the trip expenses.

    5.    *Rollison's Testimony*

---

[9] See Knaubs' Exhibit 43.

Rollison testified he was the president and manager of Gemm and Vanguard Holdings. Rollison was aware, by the spring of 2007, of the Knaubs' frustration with their home, and sent Golba to meet with the Knaubs and perform a marketing analysis on their home.  Rollison supported the idea of buying their home back and building them a new home, and stated a lot for that purpose was placed under contract.  He asserted the reason the replacement home never got built was because his lines of credit at several banks all collapsed at the same time.

He acknowledged he was having financial difficulty in December of 2006, but stated he believed the trouble was only with certain lines of credit at certain banks.  He explained he had several projects in process, and several lines of credit with different banks.  He felt optimistic some of the banks would continue to work with him.  However, by the time Avalon was formed in the spring of 2007, he recognized he was in significant financial trouble.

He admitted he attended the meeting of subcontractors and employees of Gemm during which he encouraged them to work for Avalon and described what they could expect.  He contradicted Golba's testimony that he worked "in the field" for Avalon.  Rather, he stated another person did that, while he was working on other interests.

However, he also testified he was overwhelmed, in the spring of 2007, with trying to keep Avalon together, and that the problems with the Knaubs' home would have been a relatively small issue to him.  He admitted he met with them in his office and described construction he planned in the Loveland area, stating he is prone to optimism and "forward projection."  He did not recall the conversation described by Mrs. Knaub wherein he was supposed to have shown the Knaubs maps of the planned subdivision, but admitted such maps were in his office.

According to Rollison, Avalon was formed to take over Gemm's contracts and finish Gemm's projects.  He stated Gemm's difficulties had made vendors reluctant to do business with him, and he believed the Gemm projects should be completed.  Further, he stated he wished to tend to other business besides Gemm.

Rollison conceded Gemm transferred money to Avalon, and admitted his son Miles may have made some of the transfers.  He stated the money that was being transferred from Gemm to Avalon was not Gemm's reserves, but rather consisted of construction loan proceeds on loans he had obtained.  Rollison stated he had no ownership interest in Avalon, and admitted he was wrong to sign a contract as a manager of Avalon.  He stated it was Golba's company.  However, he conceded Avalon paid him from time to time, and he had a debit card from Avalon which he used to pay personal expenses at times.

Rollison stated he did not set money aside for the construction of the Knaubs' new home.  However, he believed he still had resources, such as some banks in Canada who were willing to lend, at the time the agreement was reached to build the home.  He admitted that at the time he failed to obtain financing to rebuild the Knaubs' home, all the funds indicated on Plaintiffs' Exhibit 17 had been transferred to Avalon from Gemm, giving

Avalon approximately $465,000. He denied he planned to transfer the funds from Gemm to Avalon so he could keep a portion of them, rather than using them for projects such as the Knaubs' home, although his deposition testimony, used for impeachment, indicated he needed the money at the time. However, he asserted he could not have used the $465,000 for the Knaubs' project, because those funds, like other funds transferred to Avalon, were loan proceeds for yet-to-be-completed projects.[10]

In the spring of 2007, according to Rollison, he intended to go forward the best he could, although he knew he was in trouble on certain lines of credit. He continued to believe he could solve the Knaubs' problem, because he believed he still had access to lines of credit in excess of $20 million, while construction of a new home for the Knaubs would cost approximately $250,000. He conceded he may have been over-optimistic in continuing to believe he could make his business work "until the bitter end." When asked whether he transferred funds from Gemm to Avalon so he could make sure he had an income stream coming from Avalon because he could get no more money out of Gemm, he stated: "That is not true. That never really even crossed my mind. That was the least of my worries."

## DISCUSSION

### A. Section 523(a)(2) Claims (Golba and Rollison)

To prove a debt nondischargeable under § 523(a)(2)(A) for false pretenses, false representation, or actual fraud, a creditor must show the following four elements: "[t]he debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was [justifiable]; and the debtor's representation caused the creditor to sustain a loss."[11]

---

[10] In addition, according to the Complaint, and not disputed by the parties, in June 2008, Golba formed another Avalon entity, Avalon Homes of the West, LLC ("Avalon West"). Avalon West was alleged by the Knaubs to be a "continuation" of both Gemm and Avalon. However, Golba did not testify about Avalon West at trial, and Rollison indicated he did not know if it was a continuation of Gemm and Avalon.

[11] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2010) (internal quotation marks omitted) (quoting *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)). *See also United States v. Turner (In re Turner)*, 179 B.R. 273, 278 (Bankr. D. Colo. 1995). The *Riebesell* Court went on to cite the Supreme Court's opinion in *Field v. Mans* to clarify the proper standard for the fourth element was "justifiable reliance," not "reasonable reliance":

> The fourth element of the § 523(a)(2)(A) test requires the creditor's reliance to be "reasonable." The appropriate standard is not "reasonableness" in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was "justifiable" from a subjective standpoint.

*Id.*, at 791-792 (citing *Field v. Mans*, 516 U.S. 59, 74-75 (1995)).

The testimony of Cameron, Golba, and Rollison indicates Rollison had at least one meeting with the Knaubs, in Avalon's Loveland office, during which Rollison made representations he had a number of projects in process, and described his future plans for expanding his business. The Court finds such representations gave the impression Avalon was prosperous and had the ability to complete the Knaubs' replacement home. Moreover, the evidence of Cameron, Yaromy, and Knaub, as well as that of Rollison himself, shows Rollison represented Gemm and Avalon were one and the same or that Avalon was continuing Gemm's business. In addition, this evidence demonstrates Rollison represented he was to some degree in control of Avalon, and able to promise Avalon would finish the Knaubs' home.

In addition, at the time the meeting was taking place, Rollison's testimony indicated he knew or should have known of his serious financial concerns and of the likelihood he could not complete the Knaub's home or other projects, despite his "optimism." He was experienced in the business, and had encouraged the formation of Avalon at least in part to take over projects Gemm was unable to complete because of financial difficulties, so his optimism was neither well-founded nor credible.

The Court further notes although the evidence presented at trial does not provide a basis for finding the corporate veils of either Gemm or Avalon should be pierced in this instance, and, indeed, this issue was not argued by the parties, enough evidence exists as to Rollison's personal representations as to his ability to complete the project, either through Gemm or Avalon, to find debt arising from Rollison's individual misrepresentations to be nondischargeable. Specifically, the tesimony of Cameron, Yaromy, and Golba, as well as Mrs. Knaub, demonstrates Rollison held himself out as a controlling person for Gemm, Avalon, and perhaps other entities capable of funding the project, although it appears Rollison's ownership interest, through Vanguard Holdings, was limited to Gemm. Moreover, as shown by the testimony of Golba, Rollison caused Golba to believe, and to inform the Knaubs, that Rollison had several sources of financing other than Gemm. Most importantly, at the meeting with the Knaubs held at the Avalon office in Loveland, Rollison represented to the Knaubs he possessed the financial wherewithal, based on his plans for other subdivisions, to complete their replacement home. During this meeting, according to Mrs. Knaub's testimony, Rollison gave the impression he was in charge of many projects, including projects being handled by Avalon, contributing to the Knaubs' reliance on his representations. Therefore, no matter the degree of Rollison's actual control of the various entities (Gemm. Avalon, Vanguard, or others), he nonetheless represented he controlled sufficient funding, by himself or through other entities, to complete the Knaub's new home.

Accordingly, the Court finds Rollison made false representations as to his ability to perform on his agreement to build the Knaubs a replacement house, knowing such representations to be false, with the intent to deceive the Knaubs into believing such performance would take place. In addition, Mrs. Knaub's testimony indicates the Knaubs justifiably relied on the representations, because their previous experience had shown willingness by Gemm or Avalon, at least following an attorney's letter, to attempt to fix their home's problems, and later to offer them a replacement home. Further, the Knaubs

suffered damages, in an amount to be determined in the future, arising from problems with a defective home. Thus, as to Rollison, the Knaub's debt is nondischargeable under § 523(a)(2)(A).

The § 523(a)(2)(A) evidence as to Golba is more problematic. While it is true he represented to the Knaubs a replacement house would be built for them, and while he may have known or should have made it his business to know more about Rollison's financial affairs, his testimony indicates he believed Rollison had other financial resources not tied to Gemm and Gemm's financial difficulties. Further, it appears he either did not attend or at least did not participate actively in the meeting with the Knaubs at the Loveland office. Mrs. Knaub's testimony indicates she believed Rollison was controlling the business of both Gemm and Avalon, and saw Golba as a sales and marketing person who would re-market the Knaubs' defective home.

In addition, while Golba initially pursued the replacement house with the Knaubs, he later admitted to them financing had not come through for either the replacement home lot, nor for an existing home to be offered in trade. He even advised the Knaubs to obtain counsel.

Thus, representations by Golba were not shown, by a preponderance of the evidence, to be intended to deceive the Knaubs. Further, Mrs. Knaubs' testimony reflected they relied on his statements, as a messenger for Rollison, that a replacement home would be provided, but based their decision to go forward with the deal, and therefore to create any debt owing to them, on Rollison's representations, not Golba's representations. Any reliance they placed on Golba's representations, therefore, would not be justifiable with respect to creating the debt, and would not lead to the incurring of damages based on Golba's representations. Accordingly, the § 523(a)(2)(A) claim against Golba must fail due to lack of showing an intent to deceive, lack of justifiable reliance and lack of ability to show damages.

**B.   Section 523(a)(4) Claim (Rollison Only)**

Section 523(a)(4) provides an individual debtor is not discharged from any debt for defalcation while acting in a fiduciary capacity.[12] Federal law limits the application of § 523(a)(4) to express and technical trusts, and debts alleged to be nondischargeable must arise from breach of trust obligations imposed by law, separate and distinct from any breach of contract.[13] To establish an exception to discharge under § 523(a)(4) a creditor must demonstrate the following: 1) a fiduciary relationship existed between the debtor and the creditor, and 2) the debt owed to the creditor is attributable to the fraud or defalcation

---

[12] *See generally, Fowler & Peth, Inc. v. Regan (Regan)*, 477 F.3d 1209 (10th Cir. 2007); *Young*, 91 F.3d at 1371; *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997); *In re Currin*, 55 B.R. 928, 932 (Bankr. D. Colo. 1985).

[13] *Young*, 91 F.3d at 1371; *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir. 1976).

committed by the debtor in the course of the fiduciary relationship.[14] Generally, under § 523(a)(4), defalcation can be defined as "a fiduciary-debtor's failure to account for funds that have been entrusted to it due to any breach of a fiduciary duty, whether intentional, willful, reckless, or negligent. Further, the fiduciary-debtor is charged with knowledge of the law and its duties."[15]

As explained in *Young*, the existence of a fiduciary relationship under § 523(a)(4) is determined by federal law, although state law is relevant to the inquiry.[16] Moreover, such a relationship generally exists only if money or property on which the relevant debt was based was entrusted to the debtor.[17]

In this case, Gemm's or Avalon's insolvency would create a fiduciary duty to the creditors of those entities. Rollison's use of Gemm's or Avalon's funds for personal purposes while Gemm or Avalon was insolvent would be improper in such a circumstance. However, the problem with expanding this improper practice to create an exception to discharge under § 523(a)(4) is the Knaubs have not shown they entrusted any money to Rollison. Thus, there was nothing entrusted to him against which he could commit defalcation by failing to use Gemm or Avalon funds to remit the entrusted money or to use the entrusted money for a specific purpose designated by the Knaubs. Moreover, there was nothing entrusted to him for which he could be required to make an accounting. It should be noted that entrustment of funds to Gemm or Avalon, which has not been shown, is different from the Knaubs' incurring of expenses or other possible damages as a result of relying on Rollison's misrepresentations, as discussed above. Here, in the absence of a down payment or other funds entrusted to Rollison, Gemm, or Avalon, the Knaubs' § 523(a)(4) claim against Rollison must fail.

## CONCLUSION

For the reasons stated above,

---

[14] *Storie,* 216 B.R. at 286*; Cundy v. Woods (In re Woods),* 284 B.R. 282, 288 (D. Colo. 2001).

[15] *Storie*, 216 B.R. at 288; *see also Currin*, 55 B.R. at 935 (defalcation is more encompassing than either embezzlement or misappropriation); see generally, 4 Collier on Bankruptcy, ¶ 523.10 (15th ed. 2004) (defalcation refers to a failure to produce funds entrusted to a fiduciary and applied to conduct that does not necessarily reach the level of fraud, embezzlement, or misappropriation).

[16] *Regan*, 477 F.2d at 1211 n.1*; Young*, 91 F.3d at 1371. Under Colorado law, when a corporation becomes insolvent, its directors and officers have a duty to the corporation's creditors. *Alexander v. Anstine*, 152 P.3d 497, 502 (Colo. 2007) (citing *Crowley v. Green*, 148 Colo. 142, 147-48 (1961)). However, "[a]lthough the duty is often spoken of as a fiduciary one, it does not encompass the full scope of the fiduciary duties owed by officers and directors to shareholders but instead only requires directors and officers to avoid favoring their own interests over creditors' claims." *Colborne Corp. v. Weinstein*, ___P.3d___, 2010 WL 185416 at *5 (Colo. App. January 21, 2010), cert. granted in part by *Weinstein v. Colborne Corp.*, 2010 WL 3213046 (Colo. Aug 16, 2010)).

[17] *Woods*, 284 B.R. at 289.

IT IS ORDERED the debt of Rollison to the Plaintiffs is hereby found to be nondischargeable under 11 U.S.C. § 523(a)(A).  The Court will set a hearing on damages by separate order, after which a final judgment may enter on that claim.

IT IS FURTHER ORDERED that the Plaintiffs' claims against Golba under 11 U.S.C. § 523(a)(2)(A) and against Rollison under 11 U.S.C. § 523(a)(4) are hereby denied and dismissed.

Dated May 15, 2012                               BY THE COURT:

Michael E. Romero
United States Bankruptcy Judge